**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| HONGDA CHEM USA, LLC, and HONGDA GROUP LIMITED, LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>SHANGYU SUNFIT CHEMICAL COMPANY, LTD. and YMS AGRICULTURE INTERNATIONAL CORP., )<br><br>Defendants. )<br><br>and )<br><br>SHANGYU SUNFIT CHEMICAL COMPANY, LTD., )<br><br>Third-Party Plaintiff, )<br><br>v. )<br><br>GARY DAVID MCKNIGHT; RAYMOND P. PERKINS; WEI XU; ECO AGRO RESOURCES LLC; VASTO CHEMICAL COMPANY, INC.; and KADI RESOURCES LLC, )<br><br>Third-Party Defendants. ) | 1:12CV1146 |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are numerous motions for summary judgment, all

of which have been addressed in the Memorandum Opinion and Recommendation

of the United States Magistrate Judge ("Recommendation") [Doc. #201] that was filed with the Court in accordance with 28 U.S.C. § 636(b) and, on March 15, 2018, mailed to the parties [Doc. #202].

Plaintiffs Hongda Chem USA, LLC and Hongda Group Limited, LLC (collectively "Hongda") have moved for partial summary judgment on their breach of contract claim against Defendant and Third-Party Plaintiff Shangyu Sunfit Chemical Company, Ltd. ("Sunfit"). [Doc. #145.] The Magistrate Judge recommended denying Hongda's motion to which Hongda objects, [Doc. #205].

Sunfit has also moved for summary judgment on Hongda's breach of contract claim, as well as Hongda's claims seeking a declaratory judgment and alleging intentional interference with contract, fraud, and unfair and deceptive trade practices. [Doc. #149.] The Magistrate Judge recommended denying Sunfit's motion as to Hongda's breach of contract claim, to which Sunfit objects, [Doc. #204]. The Magistrate Judge recommended granting Sunfit's motion as to Hongda's claims of intentional interference with contract and unfair and deceptive trade practices, to which Hongda objects, [Doc. #205]. No objection has been made to the recommendation to grant Sunfit's motion as to Hongda's claims seeking a declaratory judgment and alleging fraud, [see Doc. #205].

Sunfit has also moved for partial summary judgment on its counterclaim against Hongda for breach of contract. [Doc. #149.] The Magistrate Judge recommended granting this motion, and Hongda has not objected, [see Doc. #205].

2

Defendant YMS Agriculture International Corp. ("YMS") and Hongda have each moved for summary judgment on Hongda's claims of intentional interference with contract and unfair and deceptive trade practices against YMS. [Docs. #129, 143.]  The Magistrate Judge recommended denying both motions.  Only YMS objects to the recommended denial of its motion for summary judgment. [Doc. #203.]

Each third-party defendant has moved for summary judgment on the unfair and deceptive trade practices claim alleged by Sunfit. [Docs. #131, 133, 135, 137, 139, 141.]  The Magistrate Judge recommended granting Kadi Resources, LLC's motion and denying Vasto Chemical Company, Inc's motion, and no objection has been made to either recommendation, [see Docs. #204, #205[1]]. However, Sunfit objects to the recommendation to grant Eco Agro Resources LLC's motion, [Doc. #204], and Gary David McKnight, Raymond P. Perkins, and Wei Xu each object to the recommendation to deny their motions, [Doc. #205].

Pursuant to 28 U.S.C. § 636(b)(1), the Court has appropriately reviewed the portions of the Recommendation to which objections have been made and has made a de novo determination to adopt the Recommendation except for that relating to Sunfit's motion for summary judgment on Hongda's claim of unfair and

---

[1] Hongda and Third-Party Defendants filed their objections together, and Vasto Chemical Company, Inc. is listed among the objecting Third-Party Defendants in the introductory paragraph. (See Pl.'s & Third-Pty. Defs.' Obj. at 1 [Doc. #205].) However, it is not listed among the parties actually objecting, (see id. at 3, 5), and no objection is ever made to the recommendation to deny its motion.

deceptive trade practices. Specifically, the following parties' motions for summary judgment are granted: Kadi Resources, LLC and Eco Agro Resources LLC. The following parties' motions for summary judgment are denied: YMS, Vasto Chemical Company, Inc., McKnight, Perkins, Xu, and Hongda. Sunfit's motion is granted in part as to Hongda's request for a declaratory judgment and claims of intentional interference with contractual relations and fraud and as to liability on Sunfit's counterclaim against Hongda for breach of contract and denied in part as to Hongda's claims of breach of contract and unfair and deceptive trade practices.

I.[2]

A.

This case stems from a mutually exclusive sales contract between Hongda and Sunfit. Hongda Chem USA, LLC and Hongda Group Limited, LLC, owned by McKnight, Perkins, and Xu, were[3] North Carolina companies that manufactured and distributed chemical products to a worldwide market. (Am. Compl. ¶ 8 [Doc. #37]; Dep. of Wei Xu 9:2-11 (Oct. 14, 2016) [Doc. #150-10].) Sunfit is a Chinese company formed by Weihang Wang ("W. Wang") and Ju Jin Wang ("J. Wang")

<hr />

[2] The parties have each submitted exhibits in support of and opposition to the various motions. Often, the same deposition testimony was filed more than once or small portions of a particular deposition were filed piecemeal across multiple exhibits. For ease of reference, with few exceptions, each citation to record evidence notes the specific docket entry where that exhibit can be found. However, although multiple parties may have used the very same document in support of or in opposition to a motion and, hence, that document is found in multiple docket entries, only one of the docket entries is cited.

[3] Hongda Chem USA, LLC was administratively dissolved on February 5, 2015 by the North Carolina Secretary of State. (Ex. 1 to Doc. #130.)

that manufactures various chemical products, including N-(n-Butyl) thiophosphoric Triamide ("NBPT"), a chemical that is used as an ingredient in fertilizers to improve their performance. (Id. ¶¶ 4, 9; Answer to Am. Compl. ¶¶ 4, 9 [Doc. #38]; Decl. of Weihang Wang ¶¶ 1-3 (May 10, 2017) [Doc. #150-1].)  In October 2010, Hongda and Sunfit entered into a one-year contract according to which Sunfit agreed to produce NBPT exclusively for sale in North American by Hongda for purchase by Albemarle, Hongda's customer that was itself a manufacturer of NBPT in Pennsylvania but sometimes required additional sourcing of the product. (Sales Contract [Doc. #150-2]; Xu Dep. 145:18 [Doc. #150-10]; W. Wang Decl. ¶ 12.) Although any NBPT sales that Sunfit made to North America had to go through Hongda, Hongda was not required to purchase Chinese-manufactured NBPT from Sunfit. (See Sales Contract.)

From at least January 2011 through September 2011, McKnight, Perkins, and Xu were either trying to develop a new source of NBPT or identify an alternative source.  To do so, they worked with Dr. Zehui Yang in China, requiring that his research "be the property of Hongda Group", and communicated with Chinese associates. (Emails between Perkins, McKnight, & Xu (Jan. 6-16, 2011) (discussing keeping the project "under the radar") [Doc. #165-4]; Email from Xu to JIping (Mar. 29, 2011) (hoping to have "production line ready" when the contract with Sunfit is set to renew) [Doc. #165-5]; Email from McKnight to Yang (July 8, 2011) (sending "the procedure used by Albemarle for analysis of NBPT" and hoping to send sample soon) [Doc. #165-7]; Email from Yang to McKnight,

Perkins, & Xu (July 16, 2011) (updating McKnight, Perkins, & Xu on his progress with "the NBPT coating project") [Doc. #165-9]; Email from Yang to McKnight, Perkins, & Xu (July 28, 2011) (reporting on work done with NBPT sample); Email from McKnight to Yang (Sept. 6, 2011) (requesting non-disclosure of Yang because the research is Hongda Group's property) [Doc. #165-15].)

To advance development of a new source of NBPT, in July 2011, Xu traveled to Jiangxi Province and visited the Jixiang Chemical Plant whose largest customer, Long Ji, expressed an interest in financing the business. (See Email from Xu to Perkins (July 12, 2011) [Doc. #165-8]; Email from Xu to McKnight & Perkins (July 16, 2011) [Doc. #165-10].) Long had a company registered in the Virgin Islands, and, according to Xu,

> In the future, we can place order with that company. In the same time, we can state in the contract with Sunfit that we can not [sic] buy from other Chinese companies except Sunfit. This way, we can bypass the contract by doing business with [a] company in [the] Virgin Island [sic], which is not a Chinese company.

(Email from Xu to McKnight & Perkins (July 16, 2011) [Doc. #165-10].) Xu could have been referring to POP Holding Company, which is also Long's company and has an address in the British Virgin Islands. (See Xu Dep. 166:21-167-1 (describing POP Holding as Long's company) [Doc. #163-55]; Purchase Order (listing POP Holding Company's address) [Doc. #165-60].)

Throughout the summer of 2011, McKnight, Perkins, Xu, Yang, and Long sent samples of NBPT to each other. (Email from Xu to McKnight (July 28, 2011) (requesting McKnight "send the sample from Sunfit NBPT" to Long in Shanghai,

6

China) [Doc. #165-11]; Emails between Xu & Perkins (Sept. 1, 2011) (confirming that Yang's sample had arrived) [Doc. #165-14].) By early August, they were promoting this "second Chinese source" of NBPT, also described as a "'developing' source", that "has the capability of far out producing the Sunfit facility" and that Hongda "will market". (Email from Perkins to Witte (Aug. 16, 2011) [Doc. #163-19].)

As the 2010 sales contract between Hongda and Sunfit was set to expire, they were renegotiating its terms. McKnight and Xu informed Sunfit that they wanted a longer term exclusive agreement and proposed five years. (W. Wang Decl. ¶ 15.) In exchange for extending the agreement to three years, Sunfit requested "a reciprocal exclusivity provision whereby Hongda could only purchase NBPT in China from Sunfit". (Id.; see also Email from Xu to McKnight & Perkins (Sept. 20, 2011) [Doc. #165-17].) Internally, Perkins questioned the catalyst for such a request and expressed concern that "someone is talking". (Email from Xu to McKnight & Perkins (Sept. 20, 2011) [Doc. #165-17]; see also Email from Perkins to McKnight & Xu (Sept. 21, 2011) [Doc. #165-18].) Xu apparently made the requested changes[4], which McKnight approved, but Xu anticipated being able to "get around the purchase clause." (Emails between Xu & McKnight (Sept. 20-21, 2011) [Doc. #165-18].)

---

[4] Although paragraph 13 of the second sales contract ("Agreement") does include a three-year term and reciprocal exclusivity, paragraph 1 still provides for the proposed five-year term. (Agreement [Doc. #150-3].)

Over the course of the next week, in late September 2011, Sunfit and Hongda executed a second sales contract (the "Agreement") that is the subject of this litigation. (Agreement [Doc. #150-3].) For purposes of sales in North America, Sunfit agreed to produce NBPT exclusively for Hongda, and Hongda agreed to purchase Chinese-manufactured NBPT exclusively from Sunfit, at the time one of three Chinese manufacturers of NBPT. (Id. ¶¶ 1, 4; Xu Dep. 145:4-10 [Doc. #150-10].) Among the other terms was a minimum production requirement for Albemarle and a payment term of 90 days from the date of shipment. (Agreement ¶¶ 5, 11.)

Soon afterwards, in October 2011, Xu and McKnight made plans for a November visit to the Jiangxi plant with Agrium Advanced Technologies ("Agrium") of Loveland, Colorado. (Email from Xu to McKnight (Oct. 18, 2011) [Doc. #165-2]; Emails among Bob Xing, McKnight, & Xu (Oct. 20-21 2011) [Doc. #165-21]; Emails among Xing, McKnight, & Xu (Oct. 25, 28, 29, 2011) [Doc. #165-24].) They also evaluated Long's request for an exclusivity contract to which McKnight responded, "We can agree to market and sale [sic] only his product excluding our current supplier and customer?" (Emails between Xu & McKnight (Oct. 26, 2011) [Doc. #165-23].)

Not long after the Agreement was executed, in November 2011, Hongda allegedly began having issues paying Sunfit on time, and Sunfit made repeated demands for payment. (W. Wang Decl. ¶ 19; Xu Dep. 79:12-23 (testifying about a November 2011 request for past due payment), 80:2-12 (testifying that he would

receive a phone call or email requesting a payment) [Doc. #150-10].) However, according to Perkins, W. Wang's statement that "Hongda began breaching the [Agreement] shortly after it was entered into" is "factually incorrect". (Aff. of Raymond P. Perkins ¶ 14 (June 9, 2016) [Doc. #166-2].). Perkins relies on a summary report he prepared showing, among other things, the dates of shipment, Albemarle's payments to Hongda, and Hongda's payments to Sunfit. (Id. ¶¶ 14-16, 18 (citing spreadsheet (July 29, 2012) [Doc. #166-3]).) From the information in the spreadsheet, it is unclear what shipment under the Agreement would have been due, much less past due, as early as November when the first shipment recorded on the spreadsheet was not until October 13, 2011. (Spreadsheet.)

Nevertheless, as early as December 2011[5], W. Wang expressed to McKnight his desire to bill Albemarle directly, rather than go through Hongda, to improve Sunfit's cash flow, but McKnight believed this was "not viable". (Email from McKnight to McKnight (Dec. 22, 2011) [Doc. #165-26].)

At this time, W. Wang was also curious if Hongda were "sourcing elsewhere" because "import records show another supplier shipping to USA". (Id.) McKnight noted to himself, "we are walking a thin line!" (Id.) McKnight was planning to visit the Jiangxi plant in mid-February "to confirm [its] completion",

---

[5] Sunfit asserted in its brief in opposition to Hongda's motion for partial summary judgment that Exhibit AR to its brief further evidences Hongda's past-due payments as of December 2011. (See Doc. #161 at 20.) However, Exhibit AR was supposed to be filed under seal, (see Doc. #163-33), but it is not among Sunfit's related sealed documents, (see generally Decl. #165).

and McKnight, Perkins, and Xu were hoping to "get their product qualify in [sic] Ambermarle asap" and arranging for samples to ship. (Email from McKnight to Xu (Dec. 30, 2011) [Doc. #165-27]; Emails among McKnight, Perkins, & Xu (Jan. 5-6, 2012) [Doc. #165-28]; Email from Xu to McKnight & Perkins (Jan. 13, 2012) [Doc. #165-29]; Emails among Amber Bowman, Perkins, Xu, & McKnight (Jan. 19, 2012) [Doc. #165-30].)

In early March 2012[6], McKnight and Xu suspected Sunfit had shipped NBPT to Gavilon Fertilizer, LLC in the United States in violation of the Agreement. (See Email from McKnight to Xu (Mar. 5, 2012) [Doc. #165-33]; Dep. of David McKnight 57:18-19 (Aug. 5, 2016) [Doc. #144-5]; Xu Dep. 118:2-119:12 [Doc. #165-55]; Perkins Dep. 314:2-22 [Doc. #163-56].) McKnight "confronted them . . . face to face in China" and asked if "they were using a company out of Canada to represent their product" which Sunfit denied. (McKnight Dep. 205:5-15 [Doc. #163-90[7]].) The following week, McKnight proposed emailing J. Wang about, among other things, W. Wang's concern about "another source of product coming from China into the US" and telling her that, "We are in [sic] working on

---

[6] In its brief in opposition to Hongda's motion for partial summary judgment, Sunfit contends that Hongda sent a sample from the Jiangxi plant, but the exhibit in support of that assertion does not provide the support Sunfit claims. (See Doc. #161 at 22 (citing Ex. BA for Mar. 11, 2011 event).) Exhibit BA is a certificate of analysis for NBPT on Hongda Group Limited LLC letterhead dated March 11, 2011. (See Doc. #163-42.)

[7] In its brief in opposition to Hongda's motion for partial summary judgment, Sunfit cites this exhibit as including pages 177-78 of McKnight's deposition, (see Doc. #161 at 33), but the exhibit only contains pages 204-05 of his testimony.

confirming the manufacturer and control [sic] the product flow into the US." (Email from McKnight to Perkins & Xu (Mar. 12, 2012 [Doc. #165-34].) Xu responded and suggested that they "not disturb" Sunfit, "[p]ush for shipment as much as possible now", and, when Hongda owes Sunfit "about 6 million dollars" by the end of June, "we can confront her [J. Wang] in China and ask for compensation of damages." (Email from Xu to Perkins & McKnight (Mar. 13, 2012) [Doc. #165-34].) "With 6 million dollars in our hand, it will be only one option for her." (Id.)

Sunfit's requests for payments from Hongda continued through March. (See Email from Xu to McKnight (Mar. 27, 2012) [Doc. #165-35].) Xu recommended paying Sunfit for "2 containers" at that time, warned that Hongda did not want the reputation in China for making slow payments, and recommended that they "not use a lot of this money to finance the other business." (Id.)

On March 28, 2012, Sheldon Witte of Agrium again met representatives from Hongda at the Jiangxi plant in China.[8] (Email from Witte to Jeff Novak (Mar. 29, 2012) [Doc. #165-36].) His understanding was that "[t]hey should be producing in April" and that Agrium would "soon be signing a supply agreement". (Id.) Apparently, during this same March trip to China, Perkins attempted to

---

[8] In its brief in opposition to Hongda's motion for partial summary judgment, Sunfit asserts that its Exhibit BC is an email from Perkins confirming "the second Agrium tour of Plant J", but Exhibit BC does no such thing. (See Doc. #165-34.) Furthermore, Sunfit cites this as bates stamped Hongda 14905, but Exhibit BC only contains Hongda 14903-04. However, Exhibit BF contains Hongda 14905-06, which is an email from Perkins confirming his arrival in China on March 27 and a "meeting" on March 29; it does not mention or allude to Agrium. (See Doc. #165-37].)

arrange a visit by Agrium to Sunfit in March, but "Sunfit did not permit" the visit. (Perkins Aff. ¶ 22.)  Perkins himself attempted to meet with W. Wang and J. Wang at the Sunfit plant, but W. Wang told him that he "could not come to the plant on that date" and "insisted on meeting me at a hotel . . . about twenty minutes from Sunfit's plant." (Id. ¶ 24; see also W. Wang Dep. 98:18-99:22 (testifying about having met Perkins at a hotel) [Doc. #144-7].)

Over the next month, McKnight and Xu discussed and made provisions for protecting the intellectual property of their new NBPT. (See Emails between Xu & McKnight (regarding trademark) (Apr. 8-9, 2012) [Doc. #165-38]; Emails among McKnight, Xu, & Yang (regarding patent application) (Apr. 25-29, 2012) [Doc. #165-40]; Email from McKnight to Perkins & Xu (May 11, 2012) [Doc. #165-41].)

Throughout this time, Hongda's payment issues had occurred "occasionally", but after May 2012, even Xu admitted they happened "a lot". (Xu Dep. 80:17-22 [Doc. #150-10]; see also Email from Xu to McKnight (Apr. 10, 2012) (asking McKnight to pay Sunfit "something" [Doc. #165-39].)

The cause of Hongda's late payments is debated.  McKnight told Xu to "[s]tress to Mrs. Wang that we need time . . . since Albemarle is paying us late so we are delayed in our payment." (Emails between Xu and McKnight (May 8-9, 2012 [Doc. #165-42]; Xu Dep. 113:6-114:3 [Doc. #150-10]; see also Dep. of Weihang Wang 98:1-4 (Apr. 19, 2016) (testifying that Hongda said its failure to pay was caused by Albemarle's failure to pay or failure to pay timely) [Doc. #144-7].)  Perkins' spreadsheet reflects that Albemarle paid Hongda for shipments from

December 2011 through May 2012 anywhere from 63 to 154 days after Sunfit shipped the NBPT. (Spreadsheet at 1 [Doc. #166-3].) Consequently, Hongda's payments to Sunfit were often well after the contractual deadline. (Id. at 2.) After Xu told W. Wang that the cause of Hongda's late payments was Albemarle's late payments to Hongda, (Xu Dep. 113:6-114:5 [Doc. #150-10]; W. Wang Decl. ¶¶ 20, 21), Wang contacted Albemarle and learned that it had been paying Hongda on time. (W. Wang Decl. ¶¶ 22, 47.)

Apparently, around the same time, representatives from Albemarle visited Sunfit's plant in China. (See Albemarle Notes from China Visit (May 14, 2012) [Doc. #138-7].) As a result of the visit, Albemarle had the impression that if it were "willing to work with Sunfit directly, Sunfit [would] find a way to terminate the relationship with Hongda" yet "pay Hongda a commission in the future business." (Id.) Albemarle understood that Sunfit wanted "to negotiate a 5yr agreement with Alb[emarle] directly as soon as possible." (Id.) Ultimately, on May 18, 2012, Sunfit informed Hongda that it did not have the funds to continue production unless Hongda paid on time.[9] (Email from Sunfit to McKnight (May 18, 2012) [Doc. #165-43].)

---

[9] In its brief in opposition to Hongda's motion for partial summary judgment, Sunfit cites Exhibit BP as related support for the May 2012 communications between Sunfit and Hongda about Hongda's late payments. (See Doc. #161 at 24.) However, Exhibit BP is entirely in Chinese, and the Court has not located any English translation provided by any party. (See Doc. #163-57].)

The following month, June 2012, McKnight, Perkins, and Xu moved closer to having a second source of NBPT in China. (See Email from Xu to McKnight & Perkins (June 4, 2012) (discussing purchases from the Jiangxi plant) [Doc. #165-45]; Email from McKnight to Xu (June 7, 2012) (discussing purchase through Vasto) [Doc. #165-47][10]; Vasto Entity Details (evidencing that Vasto was incorporated in Delaware in January 2012) [Doc. #163-39]; Email from Xu to McKnight (purportedly[11] attaching Vasto purchase order) (June 12, 2012) [Doc. #165-49].) They also corresponded about "push[ing] Jiangxi plant asap" out of concern for Sunfit's potential difficulties in fulfilling Albemarle's latest purchase orders due to Sunfit's "shortage of electronicity". (Emails among Xu, Perkins, & McKnight (June 22, 2012) [Doc. #168-5].) In addition to Sunfit's alleged shortage of electronicity, there were other delays in shipments either resulting from customs or refrigeration that encouraged a push for "the second source for the whole operation". (See Emails among McKnight, Perkins, & Xu (Mar. 12, 2012) [Doc. #168-6], Email from Xu to Perkins & McKnight (Nov. 25, 2011) [Doc. #168-7].)

By July 2012, McKnight and Perkins were organizing a sale to Helena Chemical for delivery to West Helena, Arkansas, which would "'in all probability'

---

[10] In its brief in opposition to Hongda's motion for partial summary judgment, Sunfit cites Exhibit BV bates stamped Hongda 15655 in support of an assertion related to Vasto. (See Doc. #161 at 25.) However, Exhibit BV is not as Sunfit claims and is bates stamped Hongda 15665. (See Doc. #165-48.)

[11] The actual purchase order is purportedly attached to this email, but only the one-page email is included in Exhibit BW, despite Sunfit's citation of BW as including Hongda 15645-46. (See Docs. #161 at 26, #165-49.)

. . . be purchasing a load for Des Moines, Iowa in July also". (Email from Perkins to McKnight (July 3, 2012) [Doc. #165-51]; see also Purchase Order from Helena Chemical to Hongda Group Ltd LLC (July 10, 2012) [Doc. #165-53].) To facilitate the sale, McKnight agreed that "we buy as Vasto and Hongda buys from Vasto and sells to Helena, noone should be able to track a domestic order." (Email from McKnight to Perkins (July 3, 2012) [Doc. #165-51]; see also Bill of Lading for NBPT from POP Holding Co., Ltd. as shipper to Vasto as consignee (Aug. 16, 2012) [Doc. #165-56].)

Perkins explained to Helena Chemical Hongda's existing contractual obligations, including its "supply side agreement" with Sunfit. (Email from Perkins to Raymond (Dan) Dancy (July 10, 2012) [Doc. #165-55].) Perkins explained that the Sunfit agreement "is specific in its definitions and has 'teeth.'" (Id.) So, "[t]he material we will supply Helena from the 'new' facility[] is material from a totally separate facility [that] has no connection to Sunfit and is not bound contractually to . . . supply lines." (Id.) "The 'new' plant we are supplying material to Helena from, is in a far more remote part of China (Jiangxi Province)" than is Sunfit and is much better situated for expansion. (Id.)

Throughout late summer and early fall, the Jiangxi plant was shipping and preparing to ship NBPT, while POP Holding Company served as the vendor and Vasto was designated as the consignee. (See Emails between Xu & Perkins (Aug. 20, 2012) (discussing Long's notification of an additional container ready for shipment) [Doc. #165-57]; Emails among Xu, McKnight, & Perkins (Aug. 22-23,

2012) (discussing a "3d NBPT") [Doc. #165-59]; Purchase Order (Aug. 25, 2012) (evidencing a purchase order from Vasto to POP Holding Company with a delivery address in South Carolina) [Doc. 165-60]; Email from Xu to McKnight & Perkins (Sept. 9, 2012) (reporting on telephone call with Long about production) [Doc. #165-63]; Emails among Perkins, Allen Sutton, & Amber Bowman (Sept. 27-28, 2012) (discussing the quality of the NBPT from the Jiangxi plant that was sent to Koch) [Doc. #165-66]; Emails from Xu to McKnight (reporting on production and price of the NBPT) [Doc. #165-67].) When Helena Chemical was ready for more NBPT from Hongda, Perkins and Amber Bowman discussed the appropriate procedure for the sale, with Perkins believing that "Hongda should purchase product from Vasto and ship to Helena" to which Bowman responded, "Aren't we in contract that we will only buy from Sunfit or only sell to Albemarle [sic] isn't that the point of Vasto?" (Emails between Perkins and Bowman (Oct. 19, 2012) [Doc. #165-69].)

During this time, Hongda's payment issues with Sunfit continued. In August 2012, Sunfit "basically" stopped shipping NBPT to Hongda until Hongda "pa[id] on term". (Xu Dep. 130:17-131:1, 131:15-18 [Doc. #150-10][12].) Xu reached out to his former employer, Sinochem Ningbo, to obtain a credit line to purchase NBPT to

---

[12] In his brief in support of his motion for summary judgment, McKnight cites to his deposition at Exhibit 9 to Doc. #138 as additional evidence. (See Doc. #138 at 8.) Exhibit 9 to Doc. #138 is blank and apparently was supposed to have been filed under seal with Doc. #153, but it is not among those exhibits. (See Doc. #138-10; see generally Exs. to Doc. #153.)

fulfill Albemarle's orders. (Xu Dep. 130:6-131:8, 132:2-4 [Doc. #150-10].) Yet, even Xu testified that at that time, Hongda was holding millions of dollars of Sunfit's money. (Xu Dep. 131:9-14 [Doc. #150-10].) In September, Wang informed Hongda that Sunfit would make no further NBPT shipments unless Hongda agreed that Sunfit would receive payment directly from Albemarle, less the commission that Albemarle would pay directly to Hongda. (Wang Decl. ¶ 24; Xu Dep. 146:11-25 [Doc. #150-10]; Email from W. Wang to Xu & McKnight (Sept. 25-26, 2012) [Doc. #165-65].) Xu told W. Wang that Albemarle would not agree, but Albemarle told him that Hongda would not agree. (W. Wang Decl. ¶¶ 25, 26, 47; Xu Dep. 147:4-15.) In the early fourth quarter of 2012, Albemarle notified Hongda that it was "not going to exercise the 2013 contract". (Dep. of Raymond Patrick Perkins as 30(b)(6) Hongda Witness 400:3-15 (Apr. 26, 2013) [Doc. #150-8].) Indeed, Albemarle informed Hongda in an October 15, 2012 letter that it was revoking its earlier June 21, 2012 letter of intent to renew and that it intended to cancel the agreement with Hongda. (Letter from Phillip DeVrou to Perkins (Oct. 15, 2012 [Doc. #166-9].)

In mid-October, McKnight told Xu about an idea to form Eco Agro, because, according to Xu, they were "desperate", having "suddenly [gone] from $10 million business [to] zero dollars business", and "need[ed] [to] find a way to survive." (Xu Dep. 175:15-176:12 [Doc. #138-15].)

Finally, on October 22, 2012, Sunfit informed Hongda that if it did not pay approximately $5.4 million by October 26, 2012 that Sunfit would consider the

Agreement terminated without prejudice to its right to pursue legal action. (W. Wang Decl. ¶ 27; Letter from Lee A. Albanese to Peter Santos (Oct. 22, 2012) [Doc. #150-4].) Before Sunfit took further action, Hongda filed this action against Sunfit on October 26, 2012.

In December 2012, Eco Agro was incorporated. (Articles of Inc. [Doc. #138-4].) Soon after May 2013, production of Eco Agro's proprietary product, N-Yield, began, and the finished, formulated product was available for sale in the fall. (James Bolding Dep. 29:7-10 (Dec. 1, 2016) [Doc. #138-20]; Perkins Dep. 275:9-23.[13]) However, according to Perkins, Eco Agro's N-Yield is completely unrelated to and "is not in the same chemical class as" the coated NBPT about which McKnight and Xu were emailing Yang in September 2011. (Aff. Raymond P. Perkins ¶ 4.c. (June 23, 2017) [Doc. #168-13].)

B.

YMS is a Canadian company established by Jianheng Matt Chen in March 2011 for the purpose of selling NBPT manufactured by Jiujiang Wo Xin Chemical Company, which belonged to Chen's former university classmate. (Dep. of Jianheng Chen 16:10-17:5 [Doc. #163-1], 29:14-25 [Doc. #155-1], 38:4-16

---

[13] In his brief in support of his motion for summary judgment, McKnight cites to Chen's deposition as further evidence of the product Eco Agro produced. (Doc. #138 at 26.) However, the exhibit and its deposition pages do not include the information for which McKnight cites them. (See Doc. #138-25.) McKnight also takes liberties with the contents of other exhibits cited as evidence of the distinction between NBPT and Eco Agro's product. (Compare Doc. #138 at 25 (explanations of purported contents of Exs. 20-22) with Docs. #138-21 (Ex. 20), #153-3 (Ex. 21), #138-23 (Ex. 22).)

[Doc. #144-2] (Nov. 21-22, 2016); YMS Corporate Filings Report [Doc. #153-4].)
In 2011, YMS made its first sale of NBPT produced at Jiujiang Wo Xin to an Italian customer. (Chen Dep. 48:5-16 [Doc. #163-1].)

Then, in approximately January 2012, Chen contacted Sunfit to purchase a small amount of NBPT for one of its customers in Germany. (W. Wang Decl. ¶ 41; see also Chen Dep. 66:19-20 (referring to sale to German company) [Doc. #150-11.) This was Sunfit's first sale of NBPT to YMS. (Chen Dep. 57:2-6 [Doc. #155-3].) The sale occurred to the satisfaction of the parties, and Sunfit was willing to continue to do business with YMS. (W. Wang Decl. ¶ 41.)

During this same time period, Chen was in discussions with representatives from Agrium about meeting in March in China at "our plant" and providing a "1Kg sample of NBPT and DMPP, so [Agrium] may firstly get a 'taste' of our products". (Email from Chen to Witte (Jan. 31, 2012) [Doc. #155-8].) Chen then contacted Sunfit to request to bring a customer to tour the Sunfit plant, but, according to the Wangs, did not identify the potential customer because it was the practice of sales agents to protect their potential customer's identification as proprietary. (W. Wang. Decl. ¶¶ 39, 42; Dep. of Ju Jin Wang Dep. 112:4-16 (Mar. 29-30, 2017) [Doc. #144-6].)

On March 30, 2012, Chen brought three individuals from Agrium to the Sunfit plant, but according to the Wangs and Chen, even then Chen never

identified Agrium to Sunfit.[14] (W. Wang Decl. ¶ 39; Chen Dep. 67:8-9 [Doc. #150-11]; J. Wang Dep. 111:15-24 [Doc. #144-6]; but see W. Wang. Decl. ¶ 42 (noting that W. Wang was not present at the plant on March 30, 2012).) While Chen and Agrium were visiting the plant, J. Wang met with them to say hello while they were having lunch. (J. Wang Dep. 111:21-22 [Doc. #144-6].) When the interpreter was making introductions, J. Wang learned that the prospective customer was a "US company." (Id. 112:13-23, 113:2-5.) J. Wang testified, "He [Chen] thought I did not know, and I didn't say it either." (Id. 112:24-25.)

Witte described the meeting with YMS as "strange" with "lots of inconsistencies" and "[n]o mention of Hongda". (Email from Witte to Novak (Mar. 20, 2012) [Doc. #165-36].) He testified that "when [he] saw the front of that facility", his "main focus" was whether YMS could "supply the product" like Chen said he could. (Dep. of Sheldon Witte 66:3-5 (Feb. 24, 2017) [Doc. #167-4].) Witte remembered one of Sunfit's owners being present even at a meeting during which Witte questioned Chen "numerous times whether he was able to sell product out of that plant", because Witte understood from Perkins that "Hongda had an exclusive with Sunfit." (Id. at 56:11-57:14 (describing his questioning of Chen as "the key thing" about the meeting).) Chen told Witte "he could supply

---

[14] In its brief in opposition to Hongda's motion for partial summary judgment, Sunfit contends that Exhibit BF, containing bates stamped AAT 98, supports its description of events on March 30, 2012. (See Doc. #161 at 23.) However, Exhibit BF is bates stamped Hongda 14905-06 and does not relate in any way to the proposition for which Sunfit uses it as support. (See Doc. #165-37.)

[Agrium] inhibitors out of that plant", statements with which Witte remembered Sunfit's owner being "in agreement". (Id. at 58:5-11.) Witte found Chen's answers unsatisfactory. (Id. at 57:5-6.)

On April 1, 2012, Chen emailed representatives from Agrium to answer further their questions and address their concerns after their visit to Sunfit's plant and, in so doing, represented himself as an employee and shareholder of Sunfit. (Email from Chen to Witte & Ben Nelson (Apr. 1, 2012) [Doc. #144-8]; see also Shareholders' Meeting Resolution [Doc. #144-12].) He went on to explain that "we do sell our NBPT to one customer in North American now" who "make[s] and sell[s] agriculture grade NBPT" and "buys from us when they have a gap between demand and supply". (Email from Chen to Witte & Nelson (emphasis added); see also Chen Dep. 137:22-138:5 [Doc. #144-25].) Chen told Agrium that "[i]n China, besides us, there are two manufacturer [sic] who can product NBPT". (Email from Chen to Witte & Nelson (emphasis added).)

However, at his deposition, Chen disavowed the truth of any information contained in the email to Agrium or the attached Resolution and admitted that he created the Shareholders' Meeting Resolution. (Chen Dep. 128:10-21 [Doc. #163-1], 145:10-146:23 [Doc. #144-26[15]], 204:4-23 [Doc. #144-24]; see also J. Wang Dep. 130:10-132:5 (testifying that Chen should not have access to the company

_____

[15] Hongda filed an index of its exhibits submitted in support of its brief for summary judgment on its claims against YMS. (See Index for Exs. [Doc. #144-1].) The index lists as Exhibit 25 pages 125-27 of Chen's deposition, but Exhibit 25 is actually pages 145-47 of Chen's deposition.

seal, that the Resolution has a contract seal rather than a requisite company seal, that the signature is not hers, and that shareholder meeting resolutions are in Chinese, not English like the purported Resolution) [Doc. #144-28[16]].) Chen did so, at least in part, because after Agrium visited Sunfit's plant, it "question[ed] [him] badly", doubt[ed] [his] relationship with Sunfit", and believed "there's no way for [him] to represent Sunfit and sale [sic] NBPT to them." (Chen Dep. at 204:14-19 [Doc. #144-24].)

A few days after the plant tour, according to W. Wang, Chen asked for a formal agreement to act as an exclusive sales representative for Sunfit. (W. Wang Decl. ¶ 43; see also J. Wang Dep. 70:4-11 (testifying that Sunfit agreed to Chen's request to be a sales agent by signing an "MOU" "for the EU market" [Doc. #146-12[17].) According to W. Wang, Sunfit agreed that Chen could sell NBPT on behalf of Sunfit, but specifically told him that he could not sell NBPT to anyone in North American due to Sunfit's agreement with Hongda. (W. Wang Decl. ¶ 43.) J. Wang remembers that in April 2012, Sunfit and YMS signed an "agency agreement" that

---

[16] In Hongda's index of exhibits [Doc. #144-1], it identifies pages 130-32 of J. Wang's deposition as Exhibit 26. However, those pages are Exhibit 27. This error, among others, continues with the remainder of Hongda's exhibits filed in support of its brief at Docket Entry 144. What is listed as Exhibit 27 (page 207 of Chen's deposition) is actually Exhibit 28 (which also includes page 208 of Chen's deposition); Exhibit 28 (pages 178-79 of Chen's deposition) is actually Exhibit 29; Exhibit 29 (pages 182-183 of Chen's deposition) is actually Exhibit 30 (and only includes page 182); Exhibit 31 (pages 3-7 of Grant Thornton's expert report) is actually Exhibit 32 (and is pages 3-7 of Erik C. Lioy's expert report).

[17] It is unclear whether J. Wang is testifying about the agency agreement or the Cooperation Agreement. (See J. Wang Dep. 70:12-24 [Doc. #146-12].)

was in English which caused her to "really worr[y] about it, because [Sunfit had an] agreement with Hongda for the North American market." (J. Wang Dep. at 113:14-18 [Doc. #144-6].) She also knew that the company Chen had brought to Sunfit's plant was a U.S. company. (Id. at 113:21-24.) "So [she] stressed two points", one of which was that Sunfit could not sell products in North America because it already had Hongda as its agent.[18] (Id. at 113:19-21 [Doc. #144-6]; id. at 118:14-16, 118:25-119:4 [Doc. #146-9]; see also Chen Dep. 133:4-19, 134:19-135:3 (testifying that J. Wang told him YMS could not sell "to North America because [Sunfit] already [had] a contract with Hongda") [Doc. #144-19].)

In April 2012, YMS and Sunfit formalized this understanding in a Cooperation Agreement which purportedly[19] gave YMS the exclusive right to sell to a list of customers in Europe, but expressly forbade it from making sales in North America. (W. Wang Decl. ¶ 43; Cooperation Agreement [Doc. #150-5]; Chen Dep. 113:4-14 [Doc. #153-15], 154:4-8 [Doc. #163-1].[20]) Chen acknowledged that, even after learning that Sunfit had an agreement with Hongda that precluded YMS's sale of Sunfit NBPT in North America, YMS did not stop trying to sell NBPT

---

[18] The excerpt of J. Wang's deposition stops at the end of page 113, as she leads into her second point, but before she testifies as to that point.

[19] Although a true and correct copy of the Cooperation Agreement is attached as Exhibit D to W. Wang's Declaration, (W. Wang Decl. ¶ 44), it is in Chinese, (id. ¶ 43), and no translation other than the limited ones provided by W. Wang in paragraph 43 of his Declaration and by Chen in his deposition has been provided.

[20] In its brief in opposition to YMS's motion for summary judgment, Hongda cites Exhibit 22 of Doc. #144 to support Chen's understanding at the time. (Doc. #156 at 4.) However, Exhibit 22 of Doc. #144, filed under seal as Doc. #153-23, is on a different topic entirely.

there. (Chen Dep. 135:4-7 [Doc. #144-19].)  It was "a young company", and Chen felt that he needed to "push . . . very hard to make sales" and described himself as "desperate to earn any money". (Id. at 99:12-25 [Doc. #163-1], 135:8-10 [Doc. #144-19].)

In July 2012, YMS sold one metric ton to Agrium, by way of Shanghai Yuman International Trading Company, also known as YMS International Trading Company, which Chen "us[ed]" "to export" this "order to Agrium" because, according to Chen, as a Canadian company, YMS cannot export from China but had to use a "trading company in China" to do so. (Chen Dep. 108:5-110:24 [Doc. #163-1].)  According to Chen's wife and majority owner of YMS, Anita Huabing Shao, YMS "asked Shanghai Yuman to purchase that [NBPT] on its behalf, on YMS's behalf." (Dep. of Anita Huabing Shao (Apr. 7, 2017) [Doc. #166-8]; (Chen Dep. 38:4-16 [Doc. #144-2].)  W. Wang also averred that the sale was to a Chinese entity and YMS did not inform Sunfit that the ultimate customer was Agrium. (W. Wang Decl. ¶ 40.)  The purchase order, invoice, and bill of lading for this sale identified YMS Shanghai International Trading Co. as the supplier. (Purchase order [Doc. #144-10]; Invoice & Bill of Lading [Doc. #144-11].)  Not surprisingly, then, J. Wang testified that Sunfit did not sell NBPT to YMS, much less to Agrium. (J. Wang Dep. 116:4-8 [Doc. #144-9].)  And, W. Wang maintains that while the Agreement between Hongda and Sunfit was in effect, Sunfit did not "make a sale of NBPT in North America" and "that Sunfit had no knowledge of this sale [by YMS to Agrium in July 2012] until long after this lawsuit was filed." (W.

Wang Decl. ¶¶ 37, 45.) Sunfit claims that from late 2010 until October 26, 2012, its only sales of NBPT in North America were through Hongda to its only customer Albemarle. (W. Wang Decl. ¶ 33.)

Yet, at his deposition, Chen testified, "I purchase [sic] one metric ton from Sunfit", and communications for this July purchase were between Chen and Agrium. (Chen Dep. 66:22-23 [Doc. #150-11] (emphasis added); Email from Krishna Maruvada to Chen (July 12, 2012) [Doc. #144-10].) And, Chen and YMS proceeded with Agrium as its apparent "long term NBPT supplier", a choice that Chen believed would prove "absolutely right" for Agrium. (Email from Chen to Witte (July 23, 2012) [Doc. #144-11].)

According to Agrium's notes from a July 23, 2012 meeting with YMS, it understood that Sunfit operated two plants. (Email from Maruvada to Witte, Novak, & Ben Cicora (July 24, 2012) [Doc. #144-15].) The old plant supplied Hongda, which in turn supplied Albemarle. (Id.) "Per YMS: Hongdachem has exclusivity for the material produced in this plant. Exclusivity is limited to sales to Albemarle." (Id. (emphasis in original).) Agrium believed YMS could sell product from the old plant, as long as the end customer was not Albemarle. (Id.) On the other hand, Agrium understood that Hongda's exclusivity did not apply to the new plant and that YMS was "set up to create a new channel [to] market the product [] that is outside the scope of Hongda['s] exclusivity." (Id.) Agrium also noted that there were a lot of payment issues between Hongda and Sunfit, but that, although the Agreement was to "sunset[] in 2014", YMS believed it would be extended

"due to growing business." (Id.)  According to Maruvada of Agrium, it appeared "that YMS [was] set up to circumvent Hongda['s] exclusivity and to capture new growth beyond Albemarle." (Id.)

After the Agreement was terminated October 26, 2012, evidence shows that YMS and Sunfit continued their relationship.[21]  YMS and Gavilon entered into a sales contract for NBPT.[22] (Sales Contract (Nov. 28, 2011) [Doc. #153-17]; see also Shao Dep. 38:20-23 [Doc. #166-8].)  In April 2014, Chen and J. Wang offered a letter contract to Koch Agronomic Services, LLC on joint-YMS/Sunfit letterhead explaining that "YMS is the marketer of NBPT-based products" for Sunfit. (Letter from Chen and J. Wang to Koch (Apr. 11, 2014) [Doc. #153-9].) According to J. Wang, YMS is currently selling NBPT for Sunfit in the United States. (J. Wang Dep. at 156:4-9 (Doc. #144-18].)

II.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016).

---

[21] In support of this, Hongda asserts that in 2014, Sunfit filed "a corporate document in China listing Mr. Chen as a Sunfit shareholder." (See Doc. #174 at 6.) However, the document that Hongda submitted is in Chinese and no apparent English translation has been provided. (See Doc. #157-5.)

[22] Hongda asserts that this NBPT was manufactured by Sunfit, (see Doc. #174 at 6) (citing Doc. #144-17), but that assertion is not supported by the cited exhibit, (see Doc. #153-10), which is the YMS-Gavilon contract.

The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[23]). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id. The court cannot weigh the evidence, by failing to credit contradictory evidence, or make credibility determinations. Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651 (4th Cir. 2018). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits." Rossignol v. Voorhaar, 316 F.3d 516 (4th Cir. 2003).

III.

Hongda has moved for partial summary judgment as to liability on its claim against Sunfit for breach of contract. [Doc. #145.] It alleged that the Agreement

---

[23] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

was a valid, enforceable contract according to which it performed all of its material obligations, but that Sunfit breached the contract when it sold NBPT in North America to third parties other than Hongda and proximately caused Hongda harm. (Am. Compl. ¶¶ 47-50 [Doc. #37].)  In support of its motion for partial summary judgment, Hongda argues that it is undisputed that Sunfit sold NBPT to a North American customer in violation of the Agreement. (Hongda's Br. in Supp. at 7 [Doc. #146].)  More specifically, Hongda argues that Sunfit "us[ed] YMS to sell NBPT to U.S. based customer Agrium." (Id. at 10.)  In opposition, Sunfit contends that it did not breach the Agreement; instead, Hongda did when it failed to pay invoices timely which then excused Sunfit from further obligations under the Agreement. (Sunfit's Br. in Opp'n at 32-36 [Doc. #161].)  Hongda responds that the parties' course of performance modified the payment term and any failure to pay was Hongda's effort towards an offset remedy for Sunfit's breach. (Hongda's Reply Br. at 10-11[24], 13-14 [Doc. #174].)

The Magistrate Judge recommended denying Hongda's motion because a genuine dispute of material fact exists "as to whether the sale of NBPT to Agrium was a breach of the Agreement." (Recommendation at 14.)  Ultimately, "[w]hether Sunfit sold the NBPT to YMS, or whether YMS was used as the vehicle to sell this NBPT to Agrium – both of which would have been a violation of the Agreement –

---

[24] Hongda cites Exhibit 1 for evidence of payments it made to Sunfit, but Exhibit 1 to Doc. #174 is deliberately blank, likely because it was supposed to be separately filed under seal. (See Doc. #174-2.)  However, the sealed version of this exhibit does not appear to have been filed.

is a question of fact for the jury." (Id.)  Hongda objects to the Recommendation because, "although there may be a question as to who the sale was made to, there is no material question of fact that a breach occurred." (Hongda's Obj. at 7 [Doc. #205].)

In response to Hongda's objection, Sunfit cites to the recommendation that it should prevail on its counterclaim against Hongda for breach of contract, to which Hongda does not object, in support of its position that it "cannot be liable to Hongda for an alleged breach of the same contract which Hongda concedes would have occurred, if at all, after Hongda had already breached." (Sunfit's Resp. to Obj. at 2 [Doc. #208].)

To understand Sunfit's argument, it is necessary to review its counterclaim and the associated recommendation.  In its counterclaim against Hongda for breach of contract, Sunfit alleged "[s]ince August of 2012, Hongda has defaulted in the payment of material sums due under the [Agreement]." (Second Am. Counter-Cl. ¶ 4 [Doc. #51].)  More specifically, although "[t]he relationship between Sunfit and Hongda followed its intended contractual course from September 2011 until August 2012," Sunfit had received no payment from Hongda since August 2012 even though Albemarle had paid Hongda and that past due payments had "accumulated to an aggregate in the principal sum of $5,770,050, plus interest". (Id. ¶ 5.)  The Magistrate Judge found that the parties did not contest the Agreement's validity and that even "Hongda admitted that it did not remit monies owed to Sunfit." (Recommendation at 26.)  Any anticipatory breach argued by

Hongda "did not affect [its] obligations under the Agreement to pay for NBPT that has already been shipped, invoiced and received as of the date when Hongda treated Sunfit's alleged failure to provide adequate assurance as repudiation of the contract." (Id.) Therefore, "[b]ecause there is no genuine issue of material fact as to whether Hongda failed to remit payment for NBPT shipments received from Sunfit," it was recommended that Sunfit's motion as to Hongda's contractual liability to Sunfit be granted, (id. at 26-27), and Hongda does not object. Therefore, Hongda is liable to Sunfit for an amount to be determined by a jury.

As for Hongda's breach of contract claim against Sunfit, because the parties agree that the Agreement is a valid contract, the only issue is whether Sunfit breached its terms. See Poor v. Hill, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000) (providing the elements for a breach of contract claim). The relevant terms are:

1. Sunfit agrees to produce product NBPT exclusively for sale by Hongda Chem USA for purchase in North America (USA and Canada), for the period of five years from contract date. Hongda Chem USA agrees to buy and sell NBPT only from Sunfit in China.
   . . .
4. No material shall be sold in North America (USA and Canada) by Sunfit directly or other representatives than Hongda Chem USA during the time frame this agreement is in effect.
   . . .
11. Terms of payment will be 90 days from the date of shipment.
   . . .
13. Sunfit agrees to use Hongda Chem USA as the sole representative for NBPT for a period of 3 years after which we can renew upon mutual agreement. Hongda Chem USA agrees that Sunfit is the sole supplier of NBPT in China.
   . . .

(Agreement.)

It is undisputed that Agrium of Loveland, Colorado purchased NBPT manufactured by Sunfit in July 2012 and that it did not purchase that product from Hongda. It is also undisputed that Sunfit knew that YMS's potential customer touring Sunfit's plant in March 2012 was a "US company", whether or not Sunfit actually knew the "US company" was Agrium. However, there are genuine disputes of material facts including, but not limited to, to whom Sunfit sold the NBPT in July 2012 and whether that sale violated the terms of the Agreement in paragraphs 1, 4, and 13. The Magistrate Judge correctly determined that genuine disputes of material fact preclude awarding Hongda summary judgment on its breach of contract claim against Sunfit. The Recommendation as to this motion is adopted, and Hongda's motion for summary judgment on this claim is denied.

## IV.

### A.

Sunfit has also moved for summary judgment on Hongda's claim against it for breach of contract. [Doc. #149.] Sunfit argues that "it is uncontroverted that [it] had no knowledge" of the July 2012 sale to Agrium and that it was Hongda, not Sunfit, that breached the Agreement "from its inception." (Sunfit's Br. in Supp. at 17 [Doc. #150].) Sunfit further contends that its alleged breach "was not the sale of a material amount of NBPT." (Sunfit's Reply Br. at 3 n.2 [Doc. #170].) Ultimately, Sunfit argues that "Hongda has not supplied any such evidence" "that Sunfit, as opposed to YMS, was responsible" for the sale. (Id. at 4.) Hongda

responds that, although knowledge is not an element of a breach of contract claim, "key evidence from multiple sources suggests that Sunfit knew of YMS's efforts to market and sell Sunfit NBPT to U.S. based customers". (Hongda's Br. in Opp'n at 12-13 [Doc. #166].)  Hongda also argues that genuine disputes of material fact exist as to Sunfit's true motive for terminating the Agreement. (Id. at 14-15.)

The Magistrate Judge recommended denying Sunfit's motion for the same reasons as he recommended denying Hongda's motion on this same claim.  Sunfit objects on the bases that Hongda's earlier breach "excused any potential breach by Sunfit" and that the alleged breach "cannot be construed as 'material.'" (Sunfit's Obj. at 3 [Doc. #204].)

"As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." McClure Lumber Co. v. Helmsman Const., Inc., 585 S.E.2d 234, 239 (N.C. Ct. App. 2003).  Although it is recommended that Sunfit's breach of contract counterclaim against Hongda be granted, it cannot be determined as a matter of law that Hongda's breach of the Agreement excused Sunfit's performance as of the July 2012 sale of NBPT.  Per the language of Sunfit's breach of contract counterclaim, Hongda's liability did not arise until August 2012, one month after the sale.  To the extent that evidence otherwise supports an earlier breach by Hongda that would somehow excuse Sunfit's performance by the time of the July 2012 sale, there is a genuine dispute of material fact as to whether the parties' course of performance altered the payment term.  See N.C.

Gen. Stat. § 25-1-303 (defining course of performance). In addition, as the Magistrate Judge found, under these circumstances, the materiality of the July 2012 NBPT sale is a jury question. See McClure Lumber Co., 585 S.E.2d at 239 ("Whether a breach is material or immaterial is ordinarily a question of fact."). Therefore, the Recommendation to deny Sunfit's motion for summary judgment is adopted.

## B.

In addition, Sunfit has moved for summary judgment on Hongda's claim that it intentionally interfered with Hongda's contract with Albemarle. [Doc. #149.] Hongda alleged that Sunfit knew about its valid contract with Albemarle, yet intentionally and without justification induced Albemarle not to perform, proximately causing harm to Hongda. (Am. Compl. ¶¶ 53-58.) Sunfit argues that Albemarle performed its obligations under its agreement with Hongda and decided not to exercise its right to renew the agreement for 2013, and there is no evidence that Albemarle breached its agreement by doing so. (Sunfit's Br. in Supp. at 18 [Doc. #150].) Sunfit further argues that, even had Albemarle breached, Sunfit had a legitimate business reason for interfering. (Sunfit's Reply Br. at 6-7 [Doc. #170].) On the other hand, Hongda points to the substance of the May 2012 meeting between Albemarle and Sunfit as evidence that Sunfit intentionally interfered with the contract between Albemarle and Hongda. (Hongda's Br. in Opp'n at 16 [Doc. #166].) Hongda also believes that the evidence shows Sunfit's actions to be unjustified and the proximate cause of Hongda's harm. (Id. at 17.)

33

The Magistrate Judge recommended granting Sunfit's motion because "Hongda cannot show that Sunfit had 'no legitimate business justification for the interference'". (Recommendation at 17.)  Hongda objects to the Recommendation's purported reliance on disputed evidence and hearsay to conclude that Sunfit had a legitimate business purpose when it interfered with Hongda's agreement with Albemarle. (Hongda's Ojb. at 9-10 [Doc. #205].)

A plaintiff alleging intentional interference with contract must show (a) "a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person", (b) that the defendant "had knowledge of the plaintiff's contract with the third person", (c) that the defendant intentionally induced the third person not to perform his contract with the plaintiff", (d) "that in so doing the [defendant] acted without justification", and (e) "that the [defendant's] act caused the plaintiff actual damages." Childress v. Abeles, 84 S.E.2d 176, 181-82 (N.C. 1954).  A defendant's actions are justified when it acts for a legitimate business purpose, such as when it acts in business competition with the plaintiff, so long as its competitive actions are carried on in furtherance of its own interests and by lawful means. Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 650 (N.C. 1988); see also id. at 652 (recognizing prohibited competitive means as those including fraud and misrepresentation, among others).  Thus, "[t]he privilege (to interfere) is conditional or qualified; that is, it is lost if exercised for a wrong purpose" which, "[i]n general, . . . exists where the act is done other than as a reasonable and [b]ona fide attempt to

34

protect the interest of the defendant which is involved." <u>Smith v. Ford Motor Co.</u>, 221 S.E.2d 282, 294 (N.C. 1976).

Here, there appears to be no dispute that a valid contract existed between Hongda and Albemarle of which Sunfit was aware. However, other than the reference by Albemarle's attorney to a term permitting it to cancel the contract with Hongda, the terms of that contract are not among the evidence the parties presented. Thus, there is no evidence that Albemarle breached the contract when it rescinded its intent-to-renew letter and expressed its intent to cancel the contract.

Furthermore, to the extent that Sunfit's efforts to work directly with Albemarle show an intent to induce Albemarle to breach its contract with Hongda and if there were evidence to support such a breach, Sunfit's actions served a legitimate business purpose. Sunfit was not being paid timely by Hongda, and, to the extent its payments were delayed by Albemarle's payments to Hongda, it sought to work directly with Albemarle to rectify that situation while ensuring Hongda was paid its commissions. Sunfit did not do so with a wrongful purpose, but, instead, acted lawfully. Therefore, the Recommendation to grant Sunfit's motion for summary judgment on Hongda's claim of intentional interference with contract is adopted.

C.

Sunfit has also moved for summary judgment on Hongda's claim of unfair and deceptive trade practices. [Doc. #149.] Hongda alleged that "Sunfit and YMS

35

engaged in a pattern of deception designed to deceive Hongda, misappropriate Hongda's efforts to develop the NBPT market in North America, and deprive Hongda of the benefits of the [Agreement]." (Am. Compl. ¶ 78.) Further, Hongda alleged that "Sunfit created YMS as a vehicle to sell NBPT in North America and circumvent Hongda's exclusivity" and "misrepresented to Hongda its sales activities in North America and . . . its intentions to use Hongda as its exclusive distributor of NBPT". (Id. ¶¶ 79, 80.) Hongda also alleged that Sunfit and YMS "solicited customers through deceptive and misleading statements", "concealed from Hongda their sales in North America", used "a shell company to circumvent the clear language of a contract", and made "false and misleading statements to customers so they could distort the market and deprive Hongda of substantial revenue". (Id. ¶¶ 79-84.)

Sunfit argues that this claim is no different than Hongda's breach of contract claim and there is no evidence of substantial aggravating circumstances. (Sunfit's Br. in Supp. at 23 [Doc. #150].) Hongda relies on the evidence of Chen's deceptive acts and Sunfit's inability to explain how he was able to use Sunfit letterhead and the company seal. (Hongda's Br. in Opp'n at 20 [Doc. #166].) Hongda also contends that a reasonable fact-finder could conclude that, in March 2012, when Agrium was touring Sunfit's plant, W. Wang selected an off-site location to meet with Perkins "in a deliberate attempt to conceal the fact that Sunfit was, at that very moment, violating the [Agreement]." (Id.)

36

The Magistrate Judge recommended granting Sunfit's motion because "this is a simple breach of contract action and the evidence is insufficient to show substantial aggravating circumstances." (Recommendation at 24.) The Magistrate Judge found that a jury question existed "as to whether Chen's conduct, at the time of the sale to Agrium, is attributable to Sunfit". (Id. at 23.) However, because "the evidence is clear that any misrepresented or deceptive acts . . . would have been directed toward Agrium", "there is no evidence that Hongda relied upon statements or conduct that Mr. Chen displayed towards Agrium or any other customers." (Id. at 23-24.) Hongda objects, contending that the "Recommendation erroneously imposes a reliance requirement" and "minimiz[es] the fraudulent nature of Sunfit's own conduct" and that "[m]aterial questions of fact exist with respect to Sunfit's sanctioning and/or rewarding YMS's deceptive acts." (Hongda's Obj. at 12, 15, 17 [Doc. #205].)

"To prevail on a claim of unfair and deceptive trade practices, a plaintiff must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby." Carcano v. JBSS, LLC, 684 S.E.2d 41, 49 (N.C. Ct. App. 2009). "The determination of whether an act or practice is an unfair or deceptive practice that violations N.C.G.S. § 75-1.1 is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). A plaintiff may not simply allege a breach of contract, even if intentional, to support a claim of unfair and deceptive trade practices, but instead "must show substantial aggravating

37

circumstances attending the breach to recover". BB&T Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992).

Here, despite Sunfit's argument and the Recommendation's conclusion otherwise, the evidence of Sunfit's conduct shows substantial aggravating circumstances to distinguish this claim from Hongda's breach of contract claim.  A reasonable jury could find that Chen's alleged and admitted conduct – which would be unfair and deceptive as a matter of law – occurred and could find that Sunfit participated in that conduct.  The evidence in support of such involvement is substantially aggravating to distinguish this claim from a breach of contract.

The Magistrate Judge also concluded that Hongda's claim failed because there was no evidence that it relied on Sunfit's alleged misrepresentations to Agrium.  When a plaintiff alleges that the unfair or deceptive act or practice is the defendant's misrepresentation to the plaintiff, the plaintiff must "demonstrate reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers v. Cmty. Bank of N. Va., 747 S.E.2d 220, 226 (N.C. 2013).  However, detrimental reliance is not required in all circumstances.  What is required, though, is a showing that the defendant's conduct proximately caused injury to the plaintiff. Nixon v. Alan Vester Auto Grp., Inc., No. 1:07CV839, 2009 WL 382743, at *2, *2 n.3 (M.D.N.C. Feb. 12, 2009).

Here, Hongda need not show reliance on Sunfit's misrepresentations to Agrium, but must otherwise show that Sunfit's conduct proximately caused Hongda's injury.  In addition to Sunfit's alleged false and misleading statements to

Agrium that were purportedly made to "distort the market and deprive Hongda of substantial revenue", its alleged unfair and deceptive trade practices involve the creation of YMS to circumvent the Agreement's exclusivity requirement, its alleged misrepresentations to Hongda about its sales in North America, and its concealment of those sales in North America. Whether or not the evidence supports a finding that Sunfit did those things and, if so, whether they proximately caused Hongda injury are questions for a jury. Therefore, the Court declines to adopt the Recommendation to grant Sunfit's motion for summary judgment on Hongda's claim of unfair and deceptive trade practices, and Sunfit's motion on this claim is instead denied.

D.

In opposition to Sunfit's motion for partial summary judgment, Hongda argues that Rule 56(d) affords the court discretion to deny Sunfit's motion because Sunfit has denied Hongda "the opportunity to conduct meaningful discovery in a number of highly relevant areas" and "such evidence is 'essential' for Hongda fully to refute the claims made by Sunfit in its motion." (Hongda's Br. in Opp'n at 22-30 [Doc. #166] (citing Decl. of Peter A. Santos [Doc. #160-1]).) The Magistrate Judge, who addressed all of the motions to compel in this matter, found Hongda's arguments to be "largely an attempt to reargue discovery issues previously brought before the Court." (Recommendation at 28.) In particular, the Magistrate Judge noted, "it is unclear why Hongda failed to bring forth any new concerns prior to the filing of dispositive motions" and recommended denying Hongda's request. (Id.)

In its objection, Hongda once again requests that the Court exercises its discretion to deny Sunfit's motion for summary judgment. (Pl.'s & Third-Pty. Defs.' Obj. at 24-25 [Doc. #205].)

Hongda bases its Rule 56(d) argument on Sunfit's alleged failure to abide by the Magistrate Judge's February 10, 2017 order addressing Hongda's various motions to compel, which set March 24, 2017 as a deadline for Sunfit's compliance, and J. Wang's refusal to answer certain questions in her March 30, 2017 deposition. (Hongda's Br. in Opp'n at 22-30.) Despite Sunfit's purported failure to comply with discovery or the Court's order, Hongda did not seek further assistance from the Court. After the April 10, 2017 discovery deadline passed, the parties filed their respective motions for summary judgment in May 2017. It was not until Hongda responded in June 2017 in opposition to Sunfit's partial motion for summary judgment did it raise these issues.

The Recommendation to deny Hongda's request is adopted, and the Court declines to exercise discretion to deny Sunfit's motion for partial summary judgment based on Rule 56(d).

V.

YMS has moved for summary judgment on Hongda's claim that it intentionally interfered with Hongda's contract with Sunfit. [Doc. #129.] Hongda alleged that YMS knew about its valid Agreement with Sunfit, but intentionally and without justification induced Sunfit not to perform, proximately causing Hongda harm. (See Am. Compl. ¶¶ 61-65.) YMS acknowledges, for purposes of its

motion, that the Agreement was a valid contract about which it had knowledge, but argues that its sale to Agrium was not a material breach and that, even if it were, Sunfit initiated the breach according to Hongda's allegation that Sunfit created YMS to sell NBPT to North America. (YMS Br. in Supp. at 6 [Doc. #130].) YMS also contends that it acted as a competitor without legal malice and that there is no evidence that its sale to Agrium "caused any pecuniary harm to Hongda." (Id. at 7-8.)  On the other hand, Hongda argues that YMS's sale to Agrium was a material breach and then focuses its arguments on YMS's conduct towards Agrium purportedly as further evidence of YMS's interference. (Hongda's Br. in Opp'n at 7-9 [Doc. #156].)  It then argues that even if YMS acted with a legitimate business purpose, such a "concept only applies to prospective business relations, and not established contracts." (Id. at 11.)  Hongda contends that its resulting damages "are not limited to the single sale of NBPT to Agrium", but also include "all future sales to Agrium; all sales lots when Albemarle terminated the contract with Hongda because it could no longer supply Sunfit NBPT; and potential sales to any North American customer through late September 2016". (Id. at 13 (internal citation omitted).)

The Magistrate Judge recommended denying YMS's motion, finding genuine disputes of material fact as to the materiality of Sunfit's breach of the Agreement, Sunfit's awareness of YMS's sale of NBPT to Agrium, and the effect of YMS's forgery and misrepresentation on its privilege to interfere as a competitor. (Recommendation at 33-34; see also id. at 32 (noting "that Hongda's application

of the law is misplaced" and that "[q]ualified immunity from liability from tortious interference claims is not limited to prospective contractual relations").) The Magistrate Judge also could not conclude that Hongda had failed to show any damages. (Id. at 34.)

YMS bases its first objection on another recommendation by the Magistrate Judge – the uncontested recommendation to grant Sunfit's motion for partial summary judgment as to liability on its claim against Hongda for breach of the Agreement. (YMS's Obj. at 5-6 (referring to pages 24-27 of the Recommendation) [Doc. #203].) The Magistrate Judge explained that, while the amount of damages Hongda owes to Sunfit is disputed, "Hongda has admitted that it did not remit monies owed to Sunfit." (Recommendation at 26.) According to YMS, "[m]uch, if not all, of the missed payments were before July 2012" and, "[t]hus, even before July 2012, Hongda was substantially in breach of the [Agreement]." (YMS's Obj. at 5.) As a result, YMS argues, its sale of NBPT in July 2012 to Agrium, "even if technically in violation of the terms of the [Agreement], could not amount to a breach of contract by Sunfit because Sunfit was already relieved of its obligation to perform by Hongda's earlier failure to pay." (Id.) YMS also maintains that the sale to Agrium "is so insignificant that this Court can determine it is not material as a matter of law" and that there is no evidence of its intent to injure Hongda, that Hongda was injured, or that, even if it had been, that YMS's actions caused the injury. (Id. at 6-8.) Hongda responds that it was not in breach of the Agreement when YMS intentionally induced Sunfit to breach, because Hongda's and Sunfit's

course of performance had modified the payment term. (Hongda's Resp. at 4-5 [Doc. #207].)  Hongda further reiterates that YMS's breach was material and that YMS acted with legal malice, which at the very least is a jury question, and injured Hongda. (Id. at 9-14.)

As has previously been discussed, the recommendation to grant Sunfit's motion for partial summary judgment as to liability on its claim against Hongda for breach of contract does not resolve the parties' other claims against each other. Despite YMS's argument otherwise, there are genuine disputes of material facts as to whether Hongda's and Sunfit's course of performance modified the Agreement's payment terms and, if not, exactly when Hongda failed to make timely payments and if those failures constitute a breach that would have relieved Sunfit of its obligations under the Agreement by the time of the July 2012 sale of NBPT. These genuine disputes of material facts, along with those the Magistrate Judge identified, preclude granting summary judgment on this claim.  Therefore, the Recommendation to deny YMS's motion for summary judgment on Hongda's claim of intentional interference with contract is adopted.

VI.

YMS has also moved for summary judgment on Hongda's unfair and deceptive trade practices claim. [Doc. #129.]  YMS argues that, not only does Hongda's claim fail because it is based on the same allegations in support of its failed intentional interference claim, but that the claim fails on its own because YMS's actions were not unfair or deceptive and did not proximately injure Hongda

43

because they were directed at Agrium. (YMS's Br. in Supp. at 9-13 [Doc. #130].[25])

As expected, Hongda responds that YMS's actions were sufficiently aggravating to

rise above a mere breach of contract and that Hongda need not have relied on

YMS's actions towards Agrium to have been proximately harmed by them.

(Hongda's Br. in Opp'n at 16-19 [Doc. #156].)  YMS belatedly argues in its Reply

Brief that this claim does not even apply in this case, because of the territorial

limits of North Carolina's Unfair and Deceptive Trade Practices Act. (YMS's Reply

Br. at 11-12 [Doc. #167].)  However, pursuant to the Local Rules of this Court, "A

reply brief is limited to discussion of matters newly raised in the response", (L. Civ.

R. 7.3(h)), of which neither the appropriateness of the application nor the territorial

reach of the Act was one, (see generally Doc. #156).

The Magistrate Judge found that Chen's admitted "conduct was not only

deceptive, but also unfair", but recommended denying YMS's motion due to

genuine disputes of material fact "as to causation and damages on this claim."

(Recommendation at 35-36.)  In its objection, YMS maintains that Hongda is

required to prove its reliance on YMS's actions and that neither Hongda's

allegations nor evidence show damages resulting from Chen's misrepresentations

or sale to Agrium. (YMS's Obj. at 10-13 [Doc. #203].[26])

_____

[25] YMS also argues that "North Carolina does not recognize an action for civil
conspiracy", (YMS's Br. in Supp. at 10), but, as Hongda notes, it has not pled civil
conspiracy, (Hongda's Br. in Opp'n at 15).
[26] YMS also objects to the recommendation that "there is no issue with the
territorial limits" of the UDTPA. (YMS's Obj. at 13.)  However, as noted above,
YMS only belatedly made this argument in its Reply Brief yet it was not in

As discussed above, a reasonable jury could find that Chen's conduct – that as a matter of law would be unfair and deceptive – occurred.  Furthermore, the Magistrate Judge also correctly observed genuine disputes of material facts as to causation and damages.  Therefore, the Recommendation to deny YMS's motion for summary judgment on Hongda's claim of unfair and deceptive trade practices is adopted.

VII.

McKnight has moved for summary judgment on Sunfit's unfair and deceptive trade practices ("UDTPA") claim. [Doc. #137.]  Sunfit alleges that, prior to the Agreement, McKnight, Perkins, Xu, Ego Agro Resources LLC ("Eco Agro"), Vasto Chemical Company, Inc., and Kadi Resources, LLC conspired to create a competing venture according to which they would manufacture NBPT in China, secretly ship the product to the United States, and sell it. (Second Am. Countercl. ¶¶ 37-38 [Doc. #48]; see also ¶¶ 39-40.)  These defendants also allegedly induced Sunfit to manufacture and ship NBPT to Hongda for sale to Albemarle, the proceeds of which these defendants would fraudulently transfer from Hongda to invest in their scheme. (Id. ¶ 41.)  After litigation commenced, a new entity, Eco Agro, was organized and would take over the sale of NBPT in North American. (Id. ¶ 44.)

---

response to any issue Hongda raised in its brief in opposition.  Therefore, as it relates to YMS's motion for summary judgment, this argument is not properly before the Court.

McKnight focuses a lot of his summary judgment argument on Hongda's contractual relationship with Sunfit and its purported rights under the Uniform Commercial Code. (See McKnight's Br. in Supp. at 13-18 [Doc. #138].)  He then argues that Sunfit's UDTPA claim simply arises from its breach of contract claim against Hongda, that he is protected from liability because Hongda is a North Carolina limited liability company, that there is an "absence of any improper act by [him] that caused Sunfit to suffer an injury", and that Sunfit did not rely on any alleged misrepresentations by McKnight. (Id. at 19-23, 28-30.)  McKnight also attempts to distance himself from the related allegations against Eco Agro. (Id. at 23-28.[27])  In response, Sunfit argues that the evidence shows McKnight's conduct is sufficiently aggravated and that he is not shielded by North Carolina's limited liability laws. (Sunfit's Br. in Opp'n at 6-10, 13-14 [Doc. #18].)

The Magistrate Judge recommended denying McKnight's motion because of "factual disputes" from which "a reasonable jury could conclude that Xu, Perkins and McKnight conspired to commit unfair and deceptive trade practices as evidenced through the documents of record" and that North Carolina's limited liability laws do not shield them. (Recommendation at 38-40.)  In his objection, McKnight argues that "the Recommendation relies on a misunderstanding of the timeline and the terms of the contracts." (Pls.' & Third-Pty. Defs.' Objs. at 4, 17-

---

[27] Some of the exhibits that McKnight cites in support of his argument do not say what McKnight claims they do. (See McKnight's Br. in Supp. at 25 (citing Exs. 21, 22) & 26 (citing Ex. 24).)

24 [Doc. #205].) More specifically, he argues that the "Recommendation improperly relies on internal communications made during the term of the original 2010 Sales Contract, before mutual exclusivity applied and prior to the Agreement at issue", that "the Recommendation ignores the fact that Sunfit has conceded that its damages are limited to Hongda's unpaid invoices", and that "the Court relies on a Hongda purchase of NBPT from Vasto, which creates a double standard for what the Recommendation deems to be a 'legitimate business purpose'." (Id. at 17.)

First, there is no dispute that the 2010 Sales Contract did not require Hongda to purchase Chinese-manufactured NBPT from Sunfit and that Hongda and its owners were free to purchase from other sources. Nevertheless, the emails that McKnight, Perkins, and Xu exchanged during the term of the 2010 Sales Contract are relevant to their alleged deceptive acts at the time Hongda entered into the Agreement and their ongoing conduct during the term of the Agreement. In those emails, they discussed development of a new source of NBPT. As Sunfit and Hongda negotiated the terms of the Agreement and Sunfit requested a reciprocal exclusivity provision, Perkins expressed concern that someone was discussing their plans to source NBPT elsewhere while Xu believed they could work around such a provision in the Agreement. McKnight then executed the Agreement as Hongda's CEO. After the Agreement's effective date, McKnight, Perkins, and Xu continued their development of NBPT at the Jiangxi plant. The relevance of their emails predating the Agreement cannot be disputed.

47

Next, the Magistrate Judge correctly determined that damages in this case are to be determined by a jury. McKnight cites Sunfit's counsel's statement during a hearing on a motion to compel that Sunfit was "asking for the – the amount of money that was supposed to be paid over by the invoices" as a concession that Sunfit's damages are limited to Hongda's unpaid invoices. Such a statement, excerpted out of context from an argument on a motion to compel discovery, cannot be determined as a matter of law to be a concession as to damages.

Finally, there is no double standard for what is determined to be a legitimate business purpose. In contrast to the evidence of Sunfit's sale of NBPT to Albemarle directly, which a reasonable jury could find was done lawfully and without a wrongful purpose, the evidence of Hongda's purchase of NBPT through Vasto could support a reasonable jury's finding of deception and fraud. Prior to the execution of the Agreement, McKnight, Perkins, and Xu discussed and developed a new source of NBPT in China and continued to do so as they negotiated and entered into the Agreement. Even once Hongda was a party to the Agreement and bound by its reciprocal exclusivity provisions, McKnight, Perkins, and Xu continued their efforts to source NBPT from the Jiangxi plant and Vasto was integral to those prospective sales. McKnight, Perkins, and Xu planned to buy the Jiangxi NBPT as Vasto then have Hongda purchase it from Vasto because they believed the domestic purchase could not be tracked. As the Magistrate Judge found, genuine disputes of material facts preclude the award of summary judgment

to McKnight. Therefore, the Recommendation to deny McKnight's motion for summary judgment is adopted.

## VIII.

Perkins has also moved for summary judgment on Sunfit's UDTPA claim. [Doc. #139.] Sunfit's allegations against Perkins are the same as those against McKnight, (<u>see</u> Am. Countercl. ¶¶ 37-44), and Perkins' arguments and evidence in support of summary judgment on the claim are the same as those proffered by McKnight, (<u>compare</u> McKnight's Br. in Supp. [Doc. #138] & Index for Exs. [Doc. #138-1] <u>with</u> Perkins' Br. in Supp. [Doc. #140] & Index for Exs. [Doc. #140-1]). The Magistrate Judge recommended denying Perkins' motion for the same reasons as he recommended denying McKnight's motion. (Recommendation at 38-40.) Unsurprisingly, Perkins' objections to the Recommendation are identical to McKnight's. (<u>See</u> Pls.' & Third-Pty. Defs.' Objs. [Doc. 205].) For the same reasons as explained above, the Recommendation to deny Perkins' motion for summary judgment is adopted.

## IX.

As do McKnight and Perkins, Xu has moved for summary judgment on Sunfit's UDTPA claim. [Doc. #141.] Sunfit's allegations against Xu are the same as those against McKnight and Perkins, (<u>see</u> Am. Compl. ¶P 37-33), and Xu's arguments and evidence in support of summary judgment on the claim are the same as those proffered by McKnight and Perkins, (<u>compare</u> McKnight's Br. in Supp. & Index for Exs. <u>&</u> Perkins' Br. in Supp. & Index for Exs. <u>with</u> Xu's Br. in

49

Supp. [Doc. #142] & Index for Exs. [Doc. 142-1]).  Likewise, the Magistrate Judge

recommended denying Xu's motion for the same reasons as he recommended

denying McKnight's and Perkins' motions. (Recommendation at 38-40.)  And, Xu's

objections to the Recommendation are identical to McKnight's and Perkins'. (See

Pls.' & Third-Pty. Defs.' Objs.)  For the reasons explained above, the

Recommendation to deny Xu's motion for summary judgment is adopted.

X.

Eco Agro has also moved for summary judgment on Sunfit's UDTPA claim.

[Doc. #135.]  As above, Sunfit's allegations against the individual defendants are

the same as those against Eco Agro. (Second Am. Counter-Cl. ¶¶ 37-45.)  Eco

Agro's summary judgment argument is similar to those of McKnight, Perkins, and

Xu, but it also argues that it did not commit any unfair or deceptive trade

practices, as it did not exist during the effective dates of the Agreement. (Eco

Agro's Br. in Supp. [Doc. #136].)  "[I]t is impossible for Eco Agro . . . to have been

a part of an alleged conspiracy to shift business away from Hongda to Eco Agro

when Eco Agro did not come into existence until after Sunfit had terminated the

[Agreement]." (Id. at 22.)  The Magistrate Judge recommended granting Eco

Agro's motion because Eco Agro was not formed until after the Agreement was

terminated and the emails about an NBPT coating project on which Sunfit relies are

about a different product than Eco Agro's and did not specifically mention Eco

Agro. (Recommendation at 40-41.)  Sunfit objects, arguing that the

Recommendation's reliance on Eco Agro's formation date and its end product is

error and overlooks "the unethical business practices engaged in by Eco Agro and its principals, to the detriment of Sunfit." (Sunfit's Obj. at 4 [Doc. #204].)

There is no dispute that Eco Agro did not exist at that time it was alleged to have committed unfair and deceptive trade practices. Under the facts of this case, Eco Agro could not have acted prior to its corporate existence. Those whom a reasonable jury could find acted tortiously have been sued, and those claims are going forward. Therefore, the Recommendation to grant Eco Agro's motion for summary judgment on Sunfit's claim of unfair and deceptive trade practices is adopted.

## XI.

The recommendations to grant Kadi's motion [Doc. #131], deny Vasto's motion [Doc. #133], deny Hongda's motion for partial summary judgment as to its claims against YMS [Doc. #143], grant in part Sunfit's motion as to Hongda's request for declaratory judgment and claim of fraud [Doc. #149], and grant Sunfit's motion for partial summary judgment as to its counterclaim against Hongda [Doc. #149] are uncontested and are hereby adopted.

## XII.

For the reasons stated herein, the Memorandum Opinion and Recommendation of the Magistrate Judge is adopted except for that relating to Sunfit's motion for summary judgment on Hongda's claim of unfair and deceptive trade practices. IT IS HEREBY ORDERED THAT:

a. YMS Agriculture International Corp.'s Motion for Summary Judgment [Doc. #129] is DENIED;

b. Kadi Resources, LLC's Motion for Summary Judgment [Doc. #131] is GRANTED;

c. Vasto Chemical Company, Inc.'s Motion for Summary Judgment [Doc. #133] is DENIED;

d. Eco Agro Resources LLC's Motion for Summary Judgment [Doc. #135] is GRANTED;

e. Gary David McKnight's Motion for Summary Judgment [Doc. #137] is DENIED;

f. Raymond P. Perkins' Motion for Summary Judgment [Doc. #139] is DENIED;

g. Wei Xu's Motion for Summary Judgment [Doc. #141] is DENIED;

h. Hongda Chem USA, LLC's and Hongda Group Limited, LLC's Motion for Partial Summary Judgment [Doc. #143] is DENIED;

i. Hongda Chem USA, LLC's and Hongda Group Limited, LLC's Motion for Partial Summary Judgment [Doc. #145] is DENIED;

j. Shangyu Sunfit Chemical Company, Ltd.'s Motion for Summary Judgment [Doc. #149] is GRANTED IN PART as to Hongda's request for a declaratory judgment and claims of intentional interference with contractual relations and fraud and as to liability on Sunfit's counterclaim against Hongda for

k. breach of contract AND DENIED IN PART as to Hongda's claims of breach of contract and unfair and deceptive trade practices.

This the 26th day of September, 2018.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge